IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF:**<br><br>the person of David Hill Jr. | Case No. 2:24mj21 JCB |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

1.    I, Travis Kosir, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

2.    I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search.

1.    I am a Special Agent of the Federal Bureau of Investigation ("FBI"), where I have been employed in that capacity since March 2016. I am currently assigned to the Albuquerque Division of the FBI, Farmington Resident Agency, and have primary investigative responsibility for crimes that occur in Indian Country, including violent crimes such as homicide, robbery, arson, aggravated assault, and sexual assault. My law enforcement experience includes, but is not limited to, collecting evidence, interviewing subjects and witnesses, writing affidavits for and executing search warrants, conducting surveillance, supervising cooperating sources, issuing subpoenas, analyzing phone records, and analyzing financial records. I am trained and have experience in the investigation of murder, assault, sex abuse, and other violent crimes committed in Indian Country.

### PURPOSE OF AFFIDAVIT

3.    I believe there is probable cause to believe that upon the person (David Hill Jr.) described in attachment A, there now exists evidence of a violation of 18 U.S.C. §§

113(a)(3), 1153: Assault with a Dangerous Weapon in Indian Country, (the "Target

Offense").

4.     This Affidavit is intended to show there is sufficient probable cause for the

requested warrant and does not set forth all of my knowledge about this matter. The facts set

forth in this affidavit are based upon my personal observations, my training and experience,

and information obtained from various law enforcement personnel and witnesses. I have not

included each and every fact known to me concerning this investigation. I have set forth only

the facts that I believe are necessary for the limited purpose of establishing probable cause to

conduct a search of and for the items described in Attachments A and B for evidence of the

criminal conduct described herein. Additionally, unless otherwise indicated, wherever in this

Affidavit I assert that an individual made a statement, that statement is described in substance

herein and is not intended to be a verbatim recitation of such statement. Furthermore, unless

otherwise indicated, all statements contained in this Affidavit are summaries in substance and

in part. The following is true to the best of my knowledge and belief.

## STATUTORY AUTHORITY

5.     Title 18 U.S.C. § 113(a)(3) outlines the crime of *Assault with a dangerous

weapon, with intent to do bodily harm.  See also* Tenth Circuit Criminal Pattern Jury

Instructions, 2.09 (comments).

   a. *See also* Tenth Circuit Criminal Pattern Jury Instructions, 2.09 (comments).

      i.  The term "assault" means any intentional attempt or threat to inflict

          injury upon someone else, when coupled with an apparent present

          ability to do so.

      ii. The term "deadly or dangerous weapon" includes any object capable of

          inflicting death or serious bodily injury.

       iii.  The term "bodily injury" means an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought.

    b.  "[T]he term 'serious bodily injury' means bodily injury that involves a substantial risk of death, unconsciousness, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty." 18 U.S.C. § 2246(4).

6.    Title 18 U.S.C. § 1153(a) - Offenses committed within Indian country provides the following definition for jurisdiction:

    a.  "Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, kidnapping, maiming, a felony under chapter 109A, incest, **a felony assault under section 113**, an assault against an individual who has not attained the age of 16 years, felony child abuse or neglect, arson, burglary, robbery, and a felony under section 661 of this title within the Indian country, shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States." (Emphasis added)

7.    David Hill Jr. (hereinafter HILL), Vanessa Jones (hereinafter JONES) and the alleged victim in this case (J.Y. with the year of birth of 1963, hereinafter "JOHN DOE") are all enrolled members of the Navajo Nation Indian tribe, a federally recognized tribe.

8.    The crimes described in this affidavit occurred at the residence of JONES, within the exterior boundaries of the Navajo Nation Indian Reservation.

**PROBABLE CAUSE**

9.    On or about September 14, 2023, the Albuquerque Division, Farmington Resident Agency of the FBI was notified by the San Juan County Sheriff's Office ("SJCSO")

that JOHN DOE had arrived at the San Juan Regional Medical Center ("SJRMC") in Farmington, NM with two gunshot wounds. JOHN DOE indicated that he had been shot while on the Navajo Nation Indian Reservation just outside of Farmington, NM.

10.     That same day, your affiant, Navajo Nation Department of Criminal Investigations ("NNDCI") Criminal Investigator Dean Goldtooth (referred to hereinafter as "CI Goldtooth"), and Navajo Police Department ("NPD") Officers responded to SJRMC and interviewed JOHN DOE. During the interview, JOHN DOE stated he had spent the previous night at his house in Burnham, NM with JONES before driving JONES back to her residence located on Route N-36 in the afternoon.

11.     Upon arriving at JONES's residence, JONES became upset with JOHN DOE because her stove was missing and believed JOHN DOE had been involved. JONES and JOHN DOE started arguing, which lead to a physical altercation during which JONES held a knife to JOHN DOE's throat and threatened to kill him. JONES then went outside her residence and started throwing tools out of the bed of JOHN DOE's truck. JOHN DOE went outside and stopped JONES resulting in an additional physical altercation.

12.     While JONES and JOHN DOE were fighting next to JOHN DOE's truck parked in JONES's driveway, a white Jeep pulled up and JONES's uncle, later identified as David Hill Jr. (HILL), got out and went into JONES's house. JOHN DOE did not know JONES's uncle by name, only his relationship to JONES.

13.     HILL then came back out of the house. JONES got into the cab of the truck and locked herself inside. HILL was standing on the passenger side of the truck and JOHN DOE was standing next to the truck bed on the driver side of the truck when JOHN DOE heard a gunshot and felt something hit his leg. JOHN DOE did not see anyone holding a gun when he heard this gunshot. JOHN DOE started walking away from JONES's residence. JOHN DOE looked back at the residence and saw JONES and HILL standing by the doorway

of the residence and JONES was holding a handgun. JOHN DOE continued walking away from the residence. JOHN DOE then heard three more gunshots while he was walking away and felt something hit him in the shoulder. JOHN DOE did not see who was holding the gun when he heard these three gunshots. JOHN DOE continued walking to his nephew's house across Route N-36 where JOHN DOE had his motorcycle parked. JOHN DOE got onto his motorcycle and drove himself to SJRMC.

14.     JOHN DOE had a .38 Special "Detective" revolver that was inside the cab of his truck in between the driver seat and the center console when JOHN DOE drove JONES back to her residence immediately prior to the altercation. The revolver was capable of holding six rounds but was not loaded when JOHN DOE left it in the truck immediately prior to the altercation. JONES had used this revolver before and was familiar with it.

15.     JOHN DOE stated that he and JONES were occasionally romantically involved. The night prior to the shooting, JOHN DOE and JONES brought three pints of Southern Comfort whiskey to JOHN DOE's house in Burnham, NM. JONES drank two of the pints that evening. Both JOHN DOE and JONES also smoked meth that evening. The morning of the shooting, JONES drank the remaining half pint of Southern Comfort.

16.     Medical records from SJRMC documented a gunshot entrance and apparent exit wound to JOHN DOE's deltoid left shoulder and an entrance wound to his lateral thigh without an apparent exit wound. X-ray results indicated JOHN DOE had shards of bullet fragments in his leg.

17.     On or about September 14, 2023, a consent search was conducted of JOHN DOE's gold colored Dodge truck which he reported driving to JONES's house earlier that day and which JOHN DOE stated JONES subsequently drove over to JOHN DOE's nephew's house and parked it there following the shooting. During the search, six empty .38 Special cartridge casings and a fabric band holding one live .38 Special ammunition round

were found in the vehicle. Following the search, JOHN DOE stated there were no empty cartridge casings in his truck when he was last in it before getting out at JONES's house.

18.     Following the shooting on or about September 14, 2023, NPD Officers located JONES at her residence identified as Navajo Housing Authority ("NHA") House #13, Upper Fruitland, NM (referred to hereinafter as "House #13"), where JONES agreed to speak with the officers inside her house. JONES told the NPD Officers the firearm was located in the bedroom and gestured under something. NPD Officers located a silver colored revolver in a shoe box under a small dresser like shelf. The firearm was identified as a .38 Special Colt Manufacturing Co. Detective Special revolver. The revolver was collected and entered into NPD evidence storage. At the time the revolver was located by law enforcement, the six round cylinder contained five live .38 Special rounds and one empty .38 Special cartridge casing.

19.     On or about September 15, 2023, your affiant and CI Goldtooth interviewed JONES at the Navajo Adult Corrections Center in Chinle, AZ where JONES was in custody on tribal charges. After being read her Miranda rights and voluntarily agreeing to speak with investigators, JONES provided a statement regarding the events of the previous day. JONES worked for JOHN DOE and the two of them were also "friends with benefits." JONES stated after JOHN DOE drove her home the previous morning, JONES noticed her stove was missing and asked JOHN DOE if he had anything to do with it. JOHN DOE denied being involved with the missing stove and got violent with JONES. A physical altercation ensued in the kitchen during which JOHN DOE and JONES tried to choke each other. JONES grabbed a knife from the kitchen and held the dull side of the knife to JOHN DOE's neck in order to get JOHN DOE off of her. JOHN DOE would not leave JONES's house, so JONES went outside and took the Tonneau cover off JOHN DOE's truck. JOHN DOE then came out of

the house and hit JONES, causing her to fall down. The physical altercation between JOHN DOE and JONES continued outside near JOHN DOE's truck.

20.     During the fight, JONES'S UNCLE pulled up and went inside the house. JONES threw a tire out of the back of JOHN DOE's truck. When JOHN DOE went to get the tire, JONES got into the truck cab and locked it. While JONES was locked inside the cab of the truck, JOHN DOE and HILL were near the truck arguing in Navajo, but JONES did not know what they were saying. JONES got scared so she grabbed JOHN DOE's .38 Special revolver, which he kept between the driver seat and the middle console, loaded it completely with bullets from the Vikings bandoleer, pointed the gun out of the driver side window and fired one round which struck JOHN DOE. JOHN DOE went down behind the back of the truck. JONES then got out of the truck and ran inside her house. JOHN DOE walked away from the property. JONES stated she shot towards the ground because she was scared and to protect herself, but the round hit JOHN DOE.

21.     After JONES shot JOHN DOE from inside of JOHN DOE's truck, JONES and HILL ran inside her house. JONES gave the revolver to HILL and went to her bedroom. JONES denied firing any additional rounds after the one round from inside the cab of JOHN DOE's truck. When asked about additional gunshots occurring after the single shot JONES fired from the truck, JONES stated, "Well maybe my uncle shot off the gun like to scare him away you know. But he didn't get hit. Well, I don't think he did." JONES did not remember HILL shooting because she was scared and in her room while HILL was at the front door. JONES heard some "pops" while she was in her bedroom. HILL had the revolver for about five minutes before JONES came out of her room, took the revolver back from HILL, and got into JOHN DOE's truck in order to drive it back to JOHN DOE's brother's house.

22.     After dropping JOHN DOE's truck off at his brother's house, JONES kept the revolver and ran from the house. JOHN DOE chased her on his motorcycle and almost hit her

before taking off. JONES then walked back to her house. On the walk back to her house, JONES saw JOHN DOE's brown dog running toward her. JONES shot the dog because it was running towards her and was filthy and because it was JOHN DOE's dog. HILL later moved the dog's body from where JONES shot it before HILL left at some point.

23.     JONES stated that JOHN DOE had tried to choke her with a seatbelt about two months prior and had hit her in the head with a bottle on another occasion during the past summer.

24.     JONES stated she did not reload the revolver after she initially loaded it full while she was locked in the cab of JOHN DOE's truck. She did not know if HILL reloaded the revolver.

25.     JONES admitted to drinking everyday and was drinking a pint of Southern Comfort whiskey during the morning on the day of the shooting.

26.     On or about September 14, 2023, investigators interviewed an individual identified by initials C.D. and year of birth 1999 (referred to hereinafter as "WITNESS 1"). WITNESS 1 stated earlier that day he returned to his house located in the same neighborhood as NHA House #13 and saw a gold Dodge truck at House #13. WITNESS 1 thought he saw someone flip out of the bed of the truck onto the ground and was holding his leg. There was another male coming out of the passenger side of the truck and a third male coming out of House #13. WITNESS 1 continued driving to his house and parked. Right when WITNESS 1 opened his door, he swore he heard a gunshot. WITNESS 1 got back into his vehicle and circled around the back road before returning to his house. Upon returning to his house, WITNESS 1 heard four more gunshots and saw a male coming out of the fence of House #13. The male was holding his side or something. When the male heard the gunshots, he took off towards the trees to the north of House #13. WITNESS 1 went inside his house to grab something and when he came out again the gold truck was gone. WITNESS 1 estimated the

time in between the first gunshot he believed he heard and the four additional shots was three minutes.

27.     On or about September 14, 2023, investigators interviewed an individual identified by initials T.L. and year of birth 1958 (referred to hereinafter as "WITNESS 2"). WITNESS 2 reported hearing multiple gunshots followed by a male running toward the main road while looking back and limping around 1:30pm or 2:00pm that day. WITNESS 2 believed the male may have been shot. A brown truck then pulled up near the male walking along the side of the road before continuing across Route N-36 and parking near a trailer on the north side of Route N-36. WITNESS 2 then observed a female with short, light hair, a black tank top, and brown or tan pants walk from the area of the trailer toward the west. Minutes later, a male on a motorcycle drove in the same area and followed the female before driving off to the east. WITNESS 2 did not believe the male who had walked to the main road from House #13 was the same male WITNESS 2 saw on the motorcycle. After the motorcycle drove away, WITNESS 2 saw the female who had walked from the trailer on the north side of Route N-36 come back across the road. WITNESS 2 indicated a spot on the road near House #13 and stated the female shot a nuisance dog in that spot. The female had a silver revolver in her hand. Later on, a middle-aged male who stays at House #13 with the woman came out of the house and dragged the dog across the road. The male then left the area and started hitch-hiking.

28.     On or about November 27, 2023, your affiant and CI Goldtooth located HILL at his residence located in vicinity of GPS coordinates N37.218528 W109.149602 near Aneth, UT, and attempted to interview HILL. HILL was not cooperative with investigators and refused to provide any information.

29.     According to court records from the United States District Court, District of Utah filed in July 2021, HILL was convicted of violating 18 U.S.C. §113(a)(7) *Assault Resulting in Substantial Bodily Injury Within Indian Country*.

30.     Based on my training and experience, potential forensic evidence such as DNA and fingerprints may be found on items touched or handled in some way by a victim and/or perpetrator. Items such as firearms often retain forensic evidence, including DNA and fingerprints, from the person(s) who manipulated or otherwise handled the weapon which can be forensically examined and compared to "known" DNA as evidence related to the alleged crime(s).

## ITEMS TO BE SEIZED

31.     Based on my training and experience and familiarity with investigations into assaults, and my discussions with other trained law enforcement officers, I know the following:

a.  I am aware from my training and experience, as well as conversations with other law enforcement officers, that: Human DNA is often considered evidence that is helpful in furthering criminal investigations. DNA is often located or extracted from items such as hair, blood, sweat, skin cells, and other bodily substances. These items of evidence are often left at the scene of the crime or found in trace quantities on item(s) used during an assault. These items may be compared to a sample from a suspect in the case to either confirm or negate his involvement. Given sufficient samples, a crime lab may be able to make comparisons of DNA evidence to link the DNA evidence to subjects such as victims or suspects.

b.  I am aware from my training and experience that fingerprints can also be left on items used during the commission of a crime. Those fingerprints can be

compared to fingerprint impressions obtained from a suspect, which may then connect the suspect to the crime.

32.     Further, there is probable cause to believe that evidence of the Target Offense, in the form of HILL's DNA and fingerprints, is currently located on the person of HILL who is described in Attachment A of this affidavit. Rule 41of the Federal Rules of Criminal Procedure authorizes the government to seize and retain evidence and instrumentalities of a crime for a reasonable time, and to examine, analyze, and test them.

## CONCLUSION

33.     Based on the foregoing, I therefore request that a warrant be issued authorizing the search of David Hill Jr., the person described in Attachment A, for seizure of David Hill Jr.'s DNA and fingerprints, described in Attachment B, by reasonable means, including force, if David Hill Jr. physically resists, to be used for DNA and fingerprint testing and comparison by the FBI Laboratory.

34.     This affidavit was reviewed and approved for legal sufficiency by District of Utah Assistant United States Attorney Sam Pead.

Respectfully submitted,

_____

Travis Kosir
Special Agent
Federal Bureau of Investigation

Sworn telephonically, signed remotely, and transmitted by email this 9th day of January, 2024.

_____
Jared C. Bennett
UNITED STATES MAGISTRATE JUDGE

11

## ATTACHMENT A

## PERSON TO BE SEARCHED

1.     The person of David Hill Jr., date of birth xx/xx/1968, social security number xxx-xx-9123, a Native American male. Hill's last known whereabouts are his residence located in vicinity of GPS coordinates N37.218528 W109.149602 near Aneth, UT.



## **ATTACHMENT B**

## **PROPERTY TO BE SEIZED**

The following materials, which constitute evidence of violations of 18 U.S.C. § 1153, crimes committed in Indian Country and § 113(a)(3), assault with a dangerous weapon:

1.      DNA sample collected with buccal swabs from David Hill Jr, the person described in Attachment A;

2.      Fingerprint impressions from David Hill Jr. the person described in Attachment A.